UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-cv-22967-BLOOM/Louis

OPTIMUS MSO II INC.,

    Plaintiff,
v.

SIMPLY HEALTHCARE PLANS, INC.,

    Defendant.

_____/

## ORDER

**THIS CAUSE** is before the Court on Defendant Simply Healthcare Plans, Inc.'s Motion Dismiss, ECF No. [4], Plaintiff Optimus MSO II, Inc.'s Complaint, *see* ECF No. [1-2] at 2–24. Plaintiff filed a Response, ECF No. [10], to which Defendant filed a Reply, ECF No. [12]. The Court has reviewed the Motion, the parties' written submissions, the record in the case, applicable law, and is otherwise duly advised. For the following reasons, the Motion is granted.

    **I.**    **BACKGROUND**

This action is a dispute between two companies in the healthcare insurance industry. *See generally* Compl. Plaintiff is a healthcare Third-Party Administrator ("TPA"), also known as a Management Service Organization ("MSO"). *See id.* at ¶ 7. The purpose of an MSO is to assist medical practices (the MSO's "Members") with administrative tasks, including claims management. *See id.* at ¶¶ 10, 12. Defendant is a Plan Sponsor — a company that offers health plan contracts to medical practitioners ("Health Plans"). *See id.* ¶ 15. MSOs negotiate on behalf of their Members to obtain Health Plans, which enable Members to obtain payment for medical services that are covered by Medicare and/or Medicaid. *See id.*

### A.     The Relationship Between MSOs and Plan Sponsors

The basic relationship between MSOs and Plan Sponsors is as follows: each year Plan Sponsors submit bids to the Centers for Medicare & Medicaid Services ("CMS"), the agency within the U.S. Department of Health and Human Services that administers the nation's major health care programs. *See id.* at ¶ 16a, 16a n.1. A Plan Sponsor's bid represents the revenue the Plan Sponsor projects to receive for delivering medical services or products covered by Medicare or Medicaid. *See id.* at ¶ 16a. The bids allow for a level of market competition with respect to the funds available from the government for Medicare and/or Medicaid. *See id.*

After reviewing the bids from Plan Sponsors, CMS determines a prospective "per-Member-per-month" payment, or "direct subsidy" for each Health Plan. *Id.* at ¶ 16b (internal quotation marks omitted). CMS and each Plan Sponsor enter into an agreement detailing the amount CMS will pay for benefits covered by Medicare or Medicaid. *See id.* Plan Sponsors use the per-Member-per-month prospective payment determined by CMS to set prices for various Health Plans that will be offered to MSOs on the open market. *See id.* at ¶16c. MSOs review Health Plans offered by Plan Sponsors and negotiate to try to obtain the best prices and terms for their Members. *See id.* at ¶16d. At the end of the negotiation period, Plan Sponsors and MSOs enter into a written agreement setting the prices and terms for premiums, reimbursements, and deductibles. *See id.*

CMS pays Plan Sponsors the direct subsidy, usually in a lump sum, agreed upon pursuant to the CMS-Plan Sponsor Agreement. *See id.* at ¶ 16e. Because the direct subsidy is a fixed amount, Sponsors assume the risk of over- or under-estimating their actual total expenditures of the year. *See id.* Plan Sponsors then pay the MSOs in accordance with the Plan Sponsor-MSO agreement. *See id.* at 16f. Like Plan Sponsors, MSOs share the risk of over- or under-estimating yearly

expenditures. *See id.* Finally, MSOs pay their Members in accordance with MSO-Member agreements, who share risk in the same manner just described. *See id.* at ¶ 16g.

At the end of a set period, usually between four months and one year, the actual expenditures by MSO Members are reconciled against projected expenditures. *See id.* at ¶ 16h. If a Member provided *more* covered services than the anticipated amount, the Member is usually entitled to an additional payment from the MSO. *See id.* In turn, the MSO is usually entitled to an additional payment from the Plan Sponsor, and the Plan Sponsor is usually entitled to additional payment from CMS. *See id.* The payment-procedure works the same way in reverse: if a Member provides *less* services than anticipated, the money flows upstream from the Member, to the MSO, to a Plan Sponsor, and then to CMS. *See id.*

### B.     Plaintiff and Defendant's Agreement and "Stop Loss" Insurance

On June 1, 2014, Plaintiff and Defendant entered into a Primary Care Provider Agreement ("Agreement"), ECF No. [1-2] at 26–88. To induce Plaintiff to enter into the Agreement, Defendant made a variety of concessions, including certain representations regarding Medicare "Stop-Loss" protection insurance. Compl. at ¶ 24 (internal quotation marks omitted). Stop-Loss protection is a form of supplemental insurance, offered to reduce the risk of over-estimating the amount of Medicare-covered services MSO Members provide.[1] *See id.* at ¶ 25.

---

[1] Plaintiff provides the following example to explain how Stop-Loss protection works:

> Assume that, before the start of the fiscal year, a[n] MSO's "members" anticipated providing $10,000,000.00 of goods and services that are covered by Medicare. Early in the fiscal year, the government, through CMS, issues payments for the anticipated measure of Medicare reimbursements. If the MSO's "members" end up only providing $7,000,000.00 of goods and services that are covered by Medicare during the fiscal year, there is a $3,000,000.00 difference that must be returned to CMS. The $3,000,000.00 owed to CMS presents a risk to the MSO and the MSO's "members" because it might be very difficult for the MSO and the MSO's "members" to cover the $3,000,000.00 payment. As a result, Plan Sponsors, such as Simply Healthcare, offer supplemental "insurance" that limits the liability of the MSO and the MSO's "members" to CMS. The Plan Sponsor insures against part of the risk of owing money to CMS for over-estimating Medicare goods and services

3

Specifically, Defendant represented to Plaintiff that its first 1,000 Members would not incur additional insurance premiums on a per-Member-per-month basis for Stop-Loss protection. *See id.* at ¶ 29; *see also* Agreement 64. This part of the Agreement, set forth in a section entitled "Stop Loss Program," contains the following chart:

| Panel Size | Single Combined Deductible | Separate Institutional Deductible | Separate Professional Deductible | Per member per month deduction from Provider Medicaid Expense Fund |
|---|---|---|---|---|
| 1 –1000 | $6,000 | $10,000 | $3,000 | |
| 1001- 5000 | $30,000 | $40,000 | $10,000 | $9.87 |
| 5001 – 8000 | $40,000 | $60,000 | $15,000 | |
| 8001 – 10000 | $75,000 | $100,000 | $20,000 | |
| 10000 – 25000 | $150,000 | $200,000 | $25,000 | |

Agreement at 64. According to Plaintiff, had Defendant not made the concession regarding Stop-Loss protection, Plaintiff would not have purchased insurance from Defendant. *See* Compl. at ¶ 31.

### C.   Defendant Overcharges Plaintiff Stop-Loss Premiums; Fails to Reimburse Plaintiff for Stop-Loss Protection, and Attempts to Conceal the Same

Plaintiff never had more than 1,000 Members. *See id.* at ¶ 37. Nevertheless, Defendant charged Plaintiff premiums for Stop-Loss protection. *See id.* at ¶¶ 36–37. [1] Plaintiff calculates the "total amount of premium overpayments" made to Defendant "from 2015 through 2019 for Medicare 'Stop-Loss' insurance amounts to a total of $2,695,576.00." *Id.* at ¶ 39.

Defendant also refused to compensate Plaintiff for losses associated with Stop-Loss protection. Specifically, between 2015 and 2019 "there was a total Medicare 'Stop-Loss' for [Plaintiff] and it's '[M]embers' in the amount of $5,335,020.00" due to CMS. *Id.* at ¶ 41. Under

---

— some of the funds owed to CMS are paid by the MSO and the MSO's "members," but the rest is covered by the Plan Sponsor.

Compl. at ¶ 26.

the "relevant agreements,"[2] Plaintiff was responsible for 10% of the of the Stop-Loss amount, or $533,520.00 and Defendant was responsible for the remaining 90% "insurance" amount totaling $4,801,517.72. *Id.* at ¶ 43 (integral quotation marks omitted); *see also id.* at ¶ 42. Defendant asserts that it is owed a set-off amounting to $1,250,034.00 which Plaintiff disputes. *See id.* at ¶ 44. But even accounting for the set-off, according to Plaintiff, Defendant owes Plaintiff an absolute minimum of $3,551,483.72. *See id.*

Defendant altered financial spreadsheets to conceal the amount of money it owed Plaintiff. *See id.* at ¶ 46. The monthly spreadsheets were "altered without explanation; making it incredibly difficult to compare earlier spreadsheets sent by Defendant more recent spreadsheets sent by Defendant." *Id.* at ¶ 46. The alterations "ma[de] it appear that [Plaintiff] was not actually owed any additional reimbursements" and, because the alterations were made without explanation, Plaintiff did not notice them until recently." *Id.* at ¶ 47.

### D. Defendant Underpays Medicare Part D Payments and Attempts to Conceal the Same

Defendant also made misrepresentations to Plaintiff concerning Medicare Part D. *See id.* at ¶ 48. From 2015 through 2019, CMS pre-paid Defendant $5,650,179.77 in Medicare Part D reimbursements related to Plaintiff. *See id.* at ¶ 50. During the same time period, Plaintiff's Members provided goods and services covered by Medicare Part D amounting to $11,514,836.62. *See id.* at ¶ 51. The difference between the two amounts — $5,864,656.85 — is the net underpayment of Medicare Part D reimbursements. *See id.* at ¶ 52.

Under the Agreement, Defendant is obligated to reimburse Plaintiff 80% of the net underpayment, or $4,691,725.48.[3] *See id.* at ¶ 53. According to Plaintiff, Defendant concealed the

---

[2] Plaintiff does not specify what the "relevant agreements" are.

[3] Plaintiff does not specify the portion of the Agreement concerning Medicare Part D.

reimbursements owed to Plaintiff through the same "financial reporting" described with respect to the Stop-Loss payments. *See id.* at ¶ 54.

### E. Plaintiff Discovers Defendant's Overcharges and Underpayments

In early 2019, Plaintiff became suspicious that Defendant was concealing reimbursements. *See id.* at ¶ 56. Plaintiff assembled and compared monthly spreadsheets and "discover[ed] that historic financial data had been altered." *Id.* at ¶ 58; *see also id.* at ¶ 57. According to Plaintiff, the alterations "ma[de] Defendant look more profitable than it actually was" and "conceal[ed] the reimbursements" owed to Plaintiff and other companies like Plaintiff. *Id.* at ¶ 60.

Plaintiff asked Defendant about the reimbursements Defendant owed Plaintiff. *See id.* at ¶ 61. Defendant initially asked for more information, but it became clear to Plaintiff Defendant was unable to justify its financial data, particularly why "alterations to financial data always resulted in a purported reduction of reimbursements to Plaintiff." *Id.* at ¶ 62. In addition, Defendant's alterations "had a strange tendency to result in a nearly perfect rebalancing that rendered the 'net' amount due to Plaintiff . . . zero, or very close to zero." *Id.* at ¶ 63. According to Plaintiff, it is statistically unlikely that reconciliations consistently approach a net of zero.[4] *See*

---

[4] Plaintiff provides the following hypothetical to explain why consistent net balances of zero are unlikely:

> imagine that you have a contract with your power company whereby you pay a fixed amount every month based on your estimated monthly electricity usage, but that at the end of the year, you and the power company "reconcile" the fixed estimated payments against the actual amount of electricity that was used. Even with a very good prediction for the fixed monthly payments, some months would obviously show electricity usage in excess of the fixed monthly prediction while some months would show electricity usage that was below the fixed monthly prediction. While it may be possible for one or two months of electrical usage to be nearly exactly the same as the fixed predicted monthly usage, it would be very shocking if the difference between predicted usage and actual usage for each month was consistently at or near zero. The only logical way that the reported electrical usage could consistently show a nearly zero difference from reality was if someone was artificially altering the data to make the prediction and the reality balance nearly perfectly.

Compl. at ¶ 65.

*id.* at ¶¶ 64–65.

Plaintiff informed Defendant of its underpayment and demanded Defendant "rectify the problem." *Id.* at ¶ 66. Defendant denied wrongdoing. *See id.* at ¶ 67. Plaintiff obtained counsel and sent Defendant a Demand Letter dated July 1, 2019. *See id.* at ¶ 69. The parties were unable to reconcile their dispute. *See id.* at ¶ 70.

**F.     Defendant Terminates Plaintiff's Medicare and Medicaid Line of Business**

In a July 1, 2018 Letter ("Medicare Termination Letter"), ECF No. [1-2] at 99, Defendant terminated an Ancillary Care Service Agreement – Medicare Line of Business ("Medicare Ancillary Caser Service Agreement") between Plaintiff and Defendant. *See* Compl. at ¶ 72.[5] The Medicare Termination Letter states the effective termination date is August 31, 2018. *See* Medicare Termination Letter. Plaintiff claims the Medicare Termination Letter violates the notice provision of section 9.4 of the Agreement, which requires 90 days-notice prior to termination. *See* Compl. at ¶ 75.[6]

Following termination, Defendant "pounced on [Plaintiff's] relationships" with its Members and "convince[ed] [them] to break off their business relationships with Plaintiff." *Id.* at ¶ 80. Plaintiff suffered financial damage as a result of this conduct. *See id.* at ¶81.

The Medicare Termination Letter does not reference the "Medicaid line of business" between Plaintiff and Defendant. *Id.* at ¶82 (emphasis omitted). Nevertheless, Defendant

---

[5] Plaintiff attaches the Medicare Termination Letter as Exhibit D to its Complaint, but Plaintiff does not attach the Medicare Ancillary Care Service Agreement, or point to the portion of the Agreement, if any, that incorporates the Medicare Manically Care Service Agreement.

[6] Section 9.4 of the Agreement contains a provision entitled Termination Without Cause, requiring the Agreement "may be terminated by either party without cause, effective only at the end of a calendar month, which is at least ninety (90) days following the delivery of written notice to the other party." It is unclear if this portion of the Agreement is one and the same as the notice provision of the Medicare Ancillary Care Service Agreement, but the parties appear to assume this is the case.

7

terminated both the Medicare and Medicaid lines of business, without any notice with respect to the "Medicaid component of the [Agreement]". *See id.* at ¶ 83; *see also id.* at ¶ 85. As with the termination of the Medicare line of business, Plaintiff alleges Defendant "pounced" on Plaintiff's Members and "convince[ed] them to "break off their business relationship with [Plaintiff]" resulting in financial damages to Plaintiff. *See id.* at ¶ 86.

\*     \*     \*

This lawsuit followed. Plaintiff brings five claims: breach of contract (count I); an action for accounting (count II); fraud (count III); violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") (count IV); and tortious interference (count V). Defendant moves to dismiss counts II–V under Rule 12(b)(6) for failure to state a claim.

## II.     LEGAL STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (alteration added) (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (alteration added) (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

8

*Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

### III.     DISCUSSION

Defendant moves to dismiss Plaintiff's claims for an accounting (count II); fraud (count III); violation of FDUTPA (count IV); and tortious interference (count V). The Court addresses each in turn.

#### A.     Action for Accounting

Plaintiff seeks "an accounting from [Defendant] as to the funds that belong to and/or are owed to, [Plaintiff]." Compl. at ¶ 99. Defendant argues an action for accounting "is an equitable claim that is not available to Plaintiff[.]" Mot. at 3 (emphasis omitted).

Plaintiff concedes "[a]n accounting is grounded in equity and 'best understood as a remedy for a cause of action, not as a cause of action in its own right.'" Resp. at 3; *Cox Television Jacksonville, LLC v. Florida Cable, Inc.*, 5:16-cv-6-OC-32PRL, 2016 WL 11578269, at *6 (M.D. Fla. July 13, 2016) (quoting *Zaki Kulaibee Establishment v. McFliker*, 771 F.3d 1301, 1310 n. 21 (11th Cir. 2014); emphasis in *Zaki* omitted). Plaintiff further acknowledges "[u]nder Florida law, to be entitled to an equitable accounting 'a party must show either (1) a sufficiently complicated transaction and an inadequate remedy at law or (2) the existence of a fiduciary relationship." Resp.

9

Case 1:20-cv-22967-BB Document 23 Entered on FLSD Docket 10/13/2020 Page 10 of 19

CASE No. 20-cv-22967-BLOOM/Louis

at 3 n.3.[7] Here, because Plaintiff does not maintain it has a fiduciary relationship with Defendant, Plaintiff must allege complexity and an inadequate legal remedy.

The Court agrees with Defendant that Plaintiff's claim lacks the complexity required to survive a motion to dismiss. "[W]here causes of action for both a breach of contract and equitable accounting are asserted simultaneously with respect to the same underlying facts, the plaintiff can only maintain both causes of action by showing 'that the accounts between the parties are of such a complicated nature that only a court of equity can satisfactorily unravel them.'" *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 694 F. Supp. 2d 1275, 1279 (S.D. Fla. 2010) (quoting *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962); other internal quotation marks omitted).

In *Managed Care Solutions*, the court considered an equitable accounting claim brought by a company "engaged in the business of collecting . . . amounts due on patient receivables" against a corporation providing healthcare services through several hospitals. *Id.* at 1277. As here, the accounting claim was brought contemporaneously with a breach of contract claim. *See id.* at 1278. The court dismissed the former claim, noting "the method for calculating [the amount owed to Plaintiff] is outlined with specificity in the Agreement and is not complicated." *Id.* at 1280.

In this case, Plaintiff avers it "is clear from the Complaint that the transactions at issue in this litigation are highly complex," Resp. at 4, but Plaintiff fails to specify portions the portions of the Agreement it alleges are complicated enough to support its conclusion. The Court notes the Complaint sets forth the portion of the Agreement concerning Stop-Loss protection, *see* Agreement at 64, which appears readily discernable. And, although Plaintiff does not cite to the portion of the Agreement concerning Medicare Part D, Plaintiff's claim that the Agreement

---

[7] Plaintiff cites incorrectly to *Cox*, 2016 WL 11578296 at *6. The correct citation is to *Zaki Kulaibee Establishment*, 771 F.3d at 1311 (footnote call number omitted).

requires Defendant to reimburse Plaintiff 80% of Part D underpayments, *see* Compl. at ¶ 53, is not a concept so confusing a jury could not understand it.

Moreover, Plaintiff has already provided the Court with a preliminary calculation of damages. Regarding Stop-Loss overpayments, Plaintiff alleges Defendant owes it $2,695,576.00. *See id.* at ¶ 39. Regarding Stop-Loss reimbursements, Plaintiff states "the absolute minimum amount owed . . . is $3,551,483.72."[8] *See id.* at ¶ 44. And regarding Medicare Part D, Plaintiff alleges Defendant owes it $4.691,725.48. *See id.* at ¶ 53. Plaintiff does not make clear why an equitable accounting is necessary given its ability to calculate damages. Neither does Plaintiff explain why traditional discovery tools are inadequate to support its damages calculation. *See Fleet Advantage, LLC v. Mishoe*, No. 12-60710-Civ, 2013 WL 12140958, at *1 (S.D. Fla. Apr. 23, 2013) (dismissing a claim for an accounting and noting "any and all information that [the counter-claimant] need[ed] to prove his breach of contract claims could have been obtained through discovery.")

With respect to Plaintiff's reliance on *Blitz Telecom Consulting, LLC v. Peerless Network, Inc.*, 151 F. Supp. 3d 1294 (M.D. Fla. 2015) and *Traditions Senior Management, Inc. v. United Health Administratorys, Inc.*, No. 8:12-CV-2321-T-30MAP, 2013 WL 3285419 (M.D. Fla. June 27, 2013), Plaintiff does no more than rely on both cases' general (undisputed) premise that an accounting may be appropriate when a case is sufficiently complex. *See* Resp. at 4. The lack of factual or legal analysis with respect to these cases renders the citations unpersuasive.

---

[8] As noted in the Factual Bacground section of this Order, Plaintiff also asserts: "The total amount of premium overpayments by [Plaintiff] to [Defendant] during the period from 2015 through 2019 for Medicare "Stop-Loss" insurance amounts to a total of $2,695,576.00." Compl. at ¶ 39. This amount does not comport with Plaintiff's calculations in paragraphs 42–44 of the Complaint.

### B.      Fraud

Plaintiff's fraud claim concerns the Stop-Loss protection and is brought "[i]n the alternative" to its breach of contract claim. Compl. at ¶ 101 (italics removed). Plaintiff states "[i]f [Defendant] asserts that it did not breach the contract by charging the aforementioned [Stop-Loss] premiums, then [Defendant] materially misrepresented that the premiums would not be charged for the first 1000 of [Plaintiff's] MSO Members." *Id.* at ¶ 103.

Defendant argues Plaintiff's fraud claim is not sufficiently specific under Rule 9, which requires that "circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). The Eleventh Circuit

> has explained that Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Centennial Bank v. Noah Grp., LLC*, 445 F. App'x 277, 278 (11th Cir. 2011) (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001); internal quotation marks omitted).

In response Plaintiff insists it has adequately plead a "fraud in the inducement" claim and points the Court to paragraphs 24-32, 45-48, and 54-60 of the Complaint. *See* Resp. at 6. Plaintiff further states, "the Complaint alleges specifically that Defendant defrauded Plaintiff with respect to premiums for Medicare []Stop-Loss' protection for the first thousand (1,000) of [Plaintiff's Members]." Resp. 6.

The Court agrees with Defendant that Plaintiff's fraud in the inducement claim fails.[9] To state a claim for the same, a Plaintiff must allege (1) Defendant made a false statement concerning

---

[9] Defendant argues that Plaintiff, in its Response, impermissibly attempts to substitute a fraud in the inducement claim for its original fraud claim. The Court construes the allegations in the Complaint liberally and analyzes Plaintiff's claim as if it were labeled "Fraud in the Inducement."

12

a material fact (2) Defendant knew the representation was false; (3) Defendant intended the representation to induce Plaintiff's reliance; and (4) Plaintiff was injured as a result of the misrepresentation. *See Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1342 (S.D. Fla. 2012) (citation omitted). Fraud in the inducement must also satisfy the Rule 9 particularity requirement. *See id.* (citation omitted).

Turing to the paragraphs Plaintiff highlights, the Court finds Plaintiff fails to satisfy element two — knowledge or intention. Paragraphs 24–32 of the Complaint explain (1) what Stop-Loss insurance is; (2) that, while negotiating, Defendant represented that Plaintiff would not have to pay Stop-Loss Premiums for Plaintiff's first 1,000 Members; and (3) Plaintiff would not have entered into an Agreement with Defendant absent these representations. *See* Compl. 24–34. Plaintiff does not allege Defendant knew, during the negotiations period, that Defendant's alleged representation regarding the first 1,000 Member-provision was false. As to paragraphs 45–50, and 54–60 these concern allegations that Defendant attempted to conceal altered financial data, and are not related to a fraud in the *inducement* claim. *See Cutler v. Voya Fin., Inc.*, No. 18-20723-Civ, 2019 WL 1112379, at *4 (S.D. Fla. Jan. 15, 2019), *report and recommendation adopted*, No. 18-CV-20723, 2019 WL 1115885 (S.D. Fla. Feb. 5, 2019) (distinguishing between fraud in the inducement and fraud in performance and noting the former "occurs in connection with misrepresentations, statements or omissions which cause the complaining party to *enter* into a transaction[.]" (emphasis added; citation and internal quotation marks omitted)).

To the extent Plaintiff asks the Court to *infer* scienter from the allegedly altered financial statements made after the Agreement was in effect, the Court declines to do so because Plaintiff's allegations regarding the altered-monthly-financial statements lack specificity. Specifically, Plaintiff does not explain "the content of [the financial] statements and the manner in which they

13

mislead [] [P]laintiff." *Centennial Bank*, 445 F. App'x at 278. Plaintiff states Defendant made "systematic" and "clandestine" alterations enabling Defendant to "hide the fact that it owned substantial sums to [Plaintiff]," but Plaintiff does not attempt to explain what the alterations are. Plaintiff also alleges that Defendant's accounting often resulted in a "net" balance near zero makes it "incredibly unlikely" the financial-statements were not altered, but Plaintiff fails to explain the manner in which these statements misled Plaintiff.

### C. FDUTPA

To state a FDUTPA claim, Plaintiff must allege "(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Dolphin LLC v. WCI Communities, Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (citing *Rollins Inc. v. Butland*, 951 So. 2d, 860, 869 (Fla. 5th DCA 2006). Under Florida Law, an "unfair practice" is on that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to *consumers*." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015) (emphasis in original; citation and internal quotation marks omitted). "FDUTPA's stated purpose is 'to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.'" *CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, No. 3:16-CV-186-J-34JRK, 2018 WL 905752, at *14 (M.D. Fla. Feb. 15, 2018) (alteration adopted; quoting Fla. Stat. § 501.202(2)).

Defendant argues Plaintiff's claim fails because it does not (1) specify the deceptive or unfair act at issue; or (2) allege injury to consumers. *See* Mot. 9. Plaintiff responds that in the year 2001, FDUTPA was amended to permit actions by any "person" and not only "consumer[s]." Resp. 7; *see also* Florida Statutes § 501.211(providing "[i]n any action *brought by a person* who

has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in [section] 501.2105." (emphasis added)).

While Plaintiff is correct FDUTPA was amended, Plaintiff fails to respond to Defendant's arguments. Indeed, whether or not the substitution of the word "person" for "consumer" in FDUTPA broadens the group of plaintiffs having standing, Plaintiff does not identify the unfair/deceptive trade practice at issue. Plaintiff's FDUTPA count states (1) Plaintiff is a is a "consumer" under FDUTPA, Compl. at ¶ 108 (internal quotation marks omitted); (2) Defendant "unlawfully and intentionally engaged in unconscionable, unfair and/or deceptive acts and/or practices in the conduct of a trade or commerce in violation of FDUTPA," *id.* at ¶ 109; and (3) Plaintiff sustained damages as a result of the same, *see id.* at ¶ 110.[10] Plaintiff does not specify whether the deceptive trade practice is Defendant's alleged misrepresentation regarding the Stop-Loss premiums, the allegedly altered monthly statements; or Defendant's inadequate responses to Plaintiff's queries regarding the same. Defendant is also correct Plaintiff's fails to address this issue in its Reply. *See* Resp. at 6.

The Court finds Defendant's second argument — that Plaintiff fails to allege consumer injury — less convincing. Here, Plaintiff alleges *it* is the consumer that has sustained damages. *See* Compl. at ¶ 108. While Plaintiff makes this statement without elaboration, Plaintiff alleges elsewhere in the Complaint it purchased an insurance product from Defendant. *See id.* at ¶¶ 25, 31. Moreover, the definition of "consumer" under FDUTPA is broad, and includes "an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; *corporation; any commercial entity*,

---

[10] Plaintiff's allegation it is a "consumer" under FDUTPA, *see* Compl. at ¶ 108, would, if true, render its standing argument unnecessary because there is no dispute consumers may bring FDUTPA claims.

however denominated; or any other group or combination." Fla. Stat. § 501.203 (emphasis added).

The cases Defendant cites in support of its point do not concern companies that, like Plaintiff, have purchased insurance products. *See Midway Labs USA, LLC v. S. Serv. Trading, S.A.*, No. 19-24857-Civ, 2020 WL 2494608, at *4 (S.D. Fla. May 14, 2020) (dismissing a FDUTPA claim brought by a producer and against a distributor and noting the claimant "not allege in its Counterclaim that it engaged in the purchase of . . . goods."); *ADT LLC v. Vivint, Inc.*, No. 17-CV-80432, 2017 WL 5640725, at *1 (S.D. Fla. Aug. 3, 2017) (considering a FDUTPA claim brought by residential alarm business against a competitor); *Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.*, No. 4:04CV00126 ERW, 2005 WL 8176878, at *1 (E.D. Mo. Apr. 13, 2005) (considering a FDUTPA claim brought by a licensee against a sporting goods company). Stated otherwise, Defendant does not provide the Court with authority Plaintiff does not qualify as a "consumer" under FDUTPA given that Plaintiff facially qualifies as such under the broadly worded statue.

Nevertheless, because Plaintiff fails to adequately allege all elements of a FDUTPA claim, this claim should be dismissed.

### D. Tortious Interference

"Under Florida law, the elements of tortious interference with a contract or business relationship are: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Menudo Int'l, LLC v. In Miami Prod., LLC*, No. 17-21559-CIV, 2018 WL 1745395, at *3 (S.D. Fla. Apr. 11, 2018) (alteration adopted; citations and internal quotation marks omitted). "As a general rule, an action

for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Coach Servs., Inc. v. 777 Lucky Accessories, Inc.*, 752 F. Supp. 2d 1271, 1273 (S.D. Fla. 2010) (citation and internal quotation marks omitted).

Defendant argues that Plaintiff's tortious interference claim is too conclusory to survive a motion to dismiss. The Court agrees. Turning to the Complaint, Plaintiff adequately alleges the existence of a contract or business relationship with its Members. While Plaintiff does not specify *which* of its Members Defendant contacted, it need not do so at this stage. *Compare Coach Servs.*, 752 F. Supp. 2d at 1273 (dismissing tortious interference claim brought against "various customers" and noting "no cause of action exists for tortious interference with a business's relationship to the *community at large*." (emphasis added; citations and internal quotation marks omitted), *with Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19CV55-TKW-MJF, 2019 WL 8063988, at *4 (N.D. Fla. Nov. 14, 2019) (allowing tortious interference claim to proceed past the 12(b)(6) stage where claimant alleged "contractual arrangements with its existing customers."). Here, Plaintiff alleges Defendant interfered with the relationship between Plaintiff and its Members, a specific enough group to survive a motion to dismiss.

Nevertheless, Plaintiff's allegations regarding Defendant's conduct are conclusory. As noted, Plaintiff alleges Defendant "pounced" on Plaintiff's customers following the Medicare Termination Letter and "convince[ed]" them "to break off their business relationships" with Plaintiff. Compl. at ¶¶ 80, 86. Plaintiff also claims Defendant "had knowledge of such contracts," *id.* at ¶ 115; and Defendant "willfully and intentionally interfered" with the same, *id.* at ¶ 116. These allegations are conclusions, not facts, because they do not describe the interference at all. *See Dynasty Mgmt. Grp., LLC v. Alsina*, No. 16-20511-CIV, 2017 WL 9360859, at *4 (S.D. Fla.

17

Sept. 18, 2017), *aff'd sub nom. Dynasty Mgmt., LLC v. UMG Recordings, Inc.*, 759 F. App'x 784 (11th Cir. 2018) (dismissing tortious interference claim where the "allegations [did] not even allege *how* [Defendants] intentionally interfered with [Plaintiff's] contractual or business relationship[.]" (emphasis added)).

Plaintiff responds it "clearly alleges ultimate facts regarding tortious interference" and points the Court to paragraphs 78 – 80 and 83 – 87 of the Complaint. Paragraphs 78 and 79 describe the Medicare Termination Letter, *see* Compl. at ¶¶ 78–79, and as noted, paragraph 80 states Defendant "pounced" on Plaintiff's Members and "convince[ed]" them "to break off their business relationships" with Plaintiff, *id.* at ¶ 80. As explained, these allegations are conclusory and therefore insufficient. Similarly, paragraphs 83 and 84 describe how Defendant allegedly terminated the *Medicaid* line of business, *see id.* at ¶¶ 83–84, and paragraph 86 repeats the allegation Defendant "pounced" on Plaintiff's customers and "convince[ed]" them "to break off their business relationships" with Plaintiff, *id.* at 86. With regard to paragraph 85, it states that, following the termination of the Medicaid line of business, Plaintiff's "business relationships with [its] MSO 'members' was [*sic*] greatly harmed." *Id.* at ¶ 85. This allegation describes the result of the termination of the relationship *between Defendant and Plaintiff* but it does not describe Defendant's conduct *toward* Plaintiff's members. Finally, paragraph 87 alleges Plaintiff was "severely harmed" following Defendant's "wrongful termination and subsequent tortious interference" with Plaintiff's Members. Again, this is conclusory.

## IV.    CONCLUSION

Based upon the foregoing, it is **ORDERED AND ADJUDGED** that

1. Defendant Simply Healthcare Plans, Inc.'s Motion Dismiss, **ECF No. [4]**, is **GRANTED** and **counts II**, **III**, **IV**, and **V** of the Complaint, are **DISMISSED without prejudice.**

2. Plaintiff Optimus MSO II, Inc. is permitted to file an Amended Complaint **no later than October 23, 2020**.

**DONE AND ORDERED** in Chambers in Miami, Florida, this 13th day of October, 2020.

_____
**BETH BLOOM
UNITED STATES DISTRICT JUDGE**

cc: counsel of record